UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TARVIS A. CUTTS,

                Petitioner,                    Case No. 1:08-cv-6

v.                                            Honorable Paul L. Maloney

BRUCE CURTIS,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. After a jury trial, Petitioner was convicted on March 15, 2002 of possession with intent to deliver less than fifty grams of a controlled substance, Mich. Comp. Laws § 333.7401(2)(a)(iv), and carrying a concealed weapon, Mich. Comp. Laws § 750.227. Petitioner is serving prison terms of 6 to 40 years for the drug conviction and 3 to 20 years for the carrying a concealed weapon conviction. In his *pro se* petition, Petitioner raises four grounds for habeas corpus relief, as follows:

      I.        INEFFECTIVE ASSISTANCE OF COUNSEL.

      II.      ILLEGAL SEARCH AND SEIZURE.

      III.    THE PROSECUTOR ENGAGED IN MISCONDUCT WHEN HE REPEATEDLY ELICITED TESTIMONY FROM WITNESSES AND ARGUED TO THE JURY THAT PETITIONER WAS ON PAROLE AT THE TIME OF HIS ARREST.

      IV.    THE PROSECUTOR FAILED TO PRODUCE SUFFICIENT EVIDENCE TO SUSTAIN PETITIONER'S CONVICTIONS.

(Pet. at 6-7, 9-10, docket #1.)  Respondent filed an answer to the petition (docket #7) stating that the grounds should be denied because they are without merit or procedurally defaulted.  Petitioner filed a response (docket #23) to Respondent's answer.  Upon review and applying the Antiterrorism and Effective Death Penalty Act standards, I find that Petitioner's grounds for habeas corpus relief are without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from the seizure of 9.15 grams of crack cocaine and a gun from Petitioner's car at the Landmark Motel on August 1, 2001 in Grand Rapids, Michigan.

City of Grand Rapids Police Officer Scott Stormer testified that he was on bicycle patrol on August 1, 2001 with Officer David Lilly.  (Tr. II, 88-89.)  At approximately 1:00 p.m., Officers Stormer and Lilly approached the Landmark Motel at 171 28th Street in Grand Rapids and noticed two prostitutes and crack cocaine addicts, Tasha Isenhart and Nicole Paulsen, sitting in front of the motel.  (Tr. II, 89-90.)  After running a check on the women, Officer Stormer learned that Tasha was wanted for a probation violation.  (Tr. II, 90.)

Soon thereafter, Petitioner drove up in one of the motel's golf carts and mentioned that he was going to give Tasha and Nicole a ride but he had locked the car keys in the trunk of his car.  (Tr. II, 91-92.)  Petitioner was waiting for a tow truck to arrive.  Because of Tasha's probation violation, Officers Stormer and Lilly called for a patrol car to transport Tasha to the courthouse.  When the tow truck arrived, Petitioner rode in the tow truck to his car.  Eventually, Officer Michael Duke came to take Officer Lilly and Tasha to the courthouse.  (Tr. II, 92.)

Officer Stormer ran a Law Enforcement Information Network (LEIN) check on Petitioner. He determined that Petitioner was on parole. (Tr. II, 92.) Officer Stormer then received information regarding Petitioner from a motel employee, which caused him to investigate further. (Tr. II, 93.) When Officer Stormer located Petitioner, he found Petitioner and the tow truck driver standing by the open trunk of Petitioner's green 1987 Oldsmobile 98. (Tr. II, 93-94.) Officer Stormer called Officers Lilly and Duke to return to the motel for backup. (Tr. II, 93.) By the time Officers Lilly and Duke arrived, Petitioner had returned to the motel lobby. Officers Lilly and Duke then secured Petitioner's car. (Tr. II, 94.) Officer Stormer confronted Petitioner with the fact that he was on parole. Officer Stormer asked Petitioner whether they could search his car. Petitioner refused and requested to speak with his parole officer. Petitioner went inside the motel to make a phone call. (Tr. II, 95-96.) Officer Lilly contacted Petitioner's parole officer. (Tr. II, 96.) Officer Lilly eventually received authorization from Petitioner's parole officer to arrest Petitioner because he had registered at the motel with Nicole, a prostitute. Officer Duke then went to look for Petitioner and Nicole. (Tr. II, 90, 96-97.) After a short pursuit, Officer Duke apprehended Petitioner. (Tr. II, 97.) When Officer Stormer arrived, he handcuffed and searched Petitioner. (Tr. II, 97-98.) Officer Stormer found the keys to Petitioner's car, $3,300.00 and a cell phone. (Tr. II, 98-99.) Petitioner told Officer Stormer that he worked three jobs for that money but then changed his story stating that the money came from his mother's disability. (Tr. II, 98.)

Petitioner was brought back to the motel. Officer Lilly searched the car and Officer Stormer searched the trunk. (Tr. II, 100.) Officer Stormer found a black leather jacket in the trunk with three large rocks of what appeared to be crack cocaine. Petitioner then yelled from the patrol

car that the crack cocaine and jacket were Tasha's. (Tr. II, 102.) Officer Lilly found a gun under the driver's seat. Petitioner's car was then impounded. (Tr. II, 103.)

City of Grand Rapids Police Officer David Lilly testified similarly to Officer Scott Stormer regarding the events of August 1. Officer Lilly stated that he was on bike patrol with Officer Stormer. They often patrol the motel because it is known for criminal activity such as prostitution and drugs. (Tr. II, 111.) Officers Lilly and Stormer ran into two prostitutes, Tasha Isenhart and Nicole Paulsen, at the motel and learned that Tasha Isenhart was on probation. (Tr. II, 111-12.) Officers Lilly and Duke proceeded to transport Tasha to the courthouse. (Tr. II, 112-13.) When Officer Stormer received information that Petitioner was linked to Tasha and Nicole, Officer Stormer called Officers Lilly and Duke back to the motel. (Tr. II, 113.) At that time, Officer Lilly called Petitioner's parole officer. The parole officer authorized Petitioner's arrest because he was registered at the motel with Nicole Paulsen, a prostitute, but Petitioner had left the scene. (Tr. II, 112-15.) Once the officers arrested Petitioner, Officers Duke and Lilly transported Petitioner back to the motel. The officers then searched Petitioner's vehicle. (Tr. II, 116.) Officer Lilly found a loaded .32 caliber semiautomatic silver gun underneath the driver's seat and Officer Stormer found crack cocaine in the trunk. (Tr. II, 116-18.)

Dale Gooden testified as an expert witness in drugs and narcotics. Gooden works for the Michigan State Police as an analyst. Gooden tests drug evidence for controlled substances. (Tr. II, 130.) Gooden received the evidence in this case on August 3, 2001 from the Grand Rapids Police Department. (Tr. II, 139-40.) Gooden testified regarding the internal tracking system for evidence and the tests used to determine whether or not evidence is a controlled substance. (Tr. II, 131, 134, 141-44. ) Gooden weighed the evidence and found the net weight (the weight without the

packaging) to be 9.15 grams.  (Tr. II, 142.)  After testing the evidence, Gooden concluded that cocaine was present in the evidence.  (Tr. II, 144.)

Grand Rapids Police Detective Kent Cooper testified as an expert in the trafficking of narcotics.  (Tr. II, 148.)  Detective Cooper became involved in this case on August 2.  (Tr. II, 150.)  Detective Cooper testified that drug users typically possess a crack pipe and small amounts of cash.  Drug traffickers, on the other hand, typically possess pagers and cell phones and large quantities of drugs and cash.  (Tr. II, 152, 154.)  Detective Cooper determined that the 9.15 grams of crack cocaine found in this case was an amount typical of a crack cocaine seller.  (Tr. II, 162.)  He thought the street value of 9.15 grams of crack cocaine would be between $900.00 and $1,800.00. (Tr. II, 161.)  Detective Cooper testified that he has never known a prostitute to be a drug trafficker.  Prostitutes are more likely to be crack cocaine addicts.  (Tr. II, 156.)  Detective Cooper also ran Petitioner's vehicle identification number through the Secretary of State.  Petitioner was the registered owner of the car.  (Tr. II, 156-57.)  Detective Cooper testified that fingerprint analyses were performed on the gun and the crack cocaine baggy seized from Petitioner's vehicle but they did not have any usable prints.  The plastic bag of crack cocaine and the gun were admitted into evidence.  (Tr. II, 158-59.)   Detective Cooper stated that the gun was operable.  (Tr. III, 186.)  Detective Cooper also identified the motel receipt with Petitioner's and Nicole Paulsen's names as registered guests.  (Tr. III, 187.)

The prosecutor recalled Officer David Lilly to testify.  Officer Lilly testified that they searched Tasha Isenhart's purse and found three crack pipes with crack cocaine residue.  Officer Lilly did not find any drug paraphernalia on Nicole Paulsen or Petitioner.  (Tr. II, 188-89.)

City of Grand Rapids Police Officer Michael Duke testified that he was called to the motel on August 1 to transport Tasha Isenhart to jail. (Tr. III, 192-94.) Soon after he left, Officer Scott Stormer radioed Officer Duke that Petitioner was a parole violator and to arrest him. (Tr. III, 192.) Officer Duke found Petitioner walking with a female in the middle of the street. Officer Duke attempted to arrest Petitioner but Petitioner fled. (Tr. III, 193.) Officer Duke radioed for backup and pursued Petitioner. While he was pursuing Petitioner, Officer Duke noticed that Petitioner shoved his hand down his groin. (Tr. III, 194.) Petitioner eventually surrendered. At this time, Officer Stormer arrived and assisted Officer Duke in arresting Petitioner. (Tr. III, 195.) Officer Duke found a set of car keys near Petitioner's groin and removed them. (Tr. III, 196-97.) He turned the keys over to Officers David Lilly and Stormer. (Tr. III, 197.) Officer Duke observed a hand gun underneath the driver's seat of Petitioner's car. (Tr. III, 198.) He testified that a portion of the handle was sticking out so he could tell that it was a gun. (Tr. III, 198.)

Petitioner's mother, Janie Alexander, testified first for the defense. (Tr. III, 179-80.) Janie deposited Petitioner's social security checks into a savings account while Petitioner was in prison. (Tr. III, 180.) Janie withdrew $4,000.00 from the account in March or May of 2001 at Petitioner's request. (Tr. III, 182.)

Tasha Isenhart testified for the defense. (Tr. III, 208.) Tasha is a recovering cocaine addict. (Tr. III, 209-10.) On July 31, 2001, Tasha and Petitioner met. (Tr. III, 210.) The next day, Tasha and Petitioner ran into Nicole Paulsen and an unidentified "guy" around midnight. (Tr. III, 210-11.) The four of them went to the motel. They drank alcohol and got high on crack cocaine. (Tr. III, 212.) At one point, Nicole and the guy left the motel to get some more alcohol and drugs in Petitioner's car. (Tr. III, 213.) Nicole and the guy returned around 2:00 a.m. with more cocaine

and alcohol. (Tr. III, 214, 216.) Petitioner passed out that night until ten o'clock the next morning. (Tr. III, 214.) That morning, Petitioner could not find his car keys. Because Petitioner's car doors were locked, he called a tow truck. (Tr. III, 216.)

On cross-examination, Tasha admitted that she purchased crack cocaine, which was about the size of a baseball, for $100.00. (Tr. III, 232.) Tasha could not remember the person from whom she purchased the crack cocaine. Tasha purchased the cocaine a couple days before she went to the motel. (Tr. III, 234, 237.) After she bought the cocaine, Tasha placed the cocaine in a baggy. Tasha had worn Petitioner's black leather jacket that night and forgot that she had left the cocaine in the jacket because she was intoxicated. (Tr. III, 234-35.) They did not use the cocaine from Petitioner's jacket that night. (Tr. III, 243.) Tasha, Nicole and the other guy used other cocaine that night. (Tr. III, 242.) Nicole and the other guy also bought cocaine that evening. (Tr. III, 243.) Upon showing Tasha the actual crack cocaine in evidence, it was noted that the crack cocaine was smaller than a baseball size quantity. (Tr. III, 245.) Tasha also testified that she did not have any knowledge of the gun found underneath the driver's seat of Petitioner's car. (Tr. III, 236.)

Nicole Paulsen testified next for the defense. (Tr. III, 253.) Nicole ran into Petitioner and Tasha Isenhart at a restaurant. (Tr. III, 256-57.) After the restaurant, Petitioner drove them to buy drugs and then to the motel. (Tr. III, 257.) The three of them then got high at the motel. (Tr. III, 258.) That continued until the early morning when they ran into a guy nicknamed "Push" downtown. (Tr. III, 258-59.) Because Petitioner was high and drunk, Push drove Petitioner's car so they could buy more drugs. (Tr. III, 259.) Tasha, Push and Nicole eventually made another run for cocaine. Petitioner was passed out at this time so he did not go on the run. (Tr. III, 260.) When they returned to the motel, Push, Nicole and Tasha got high on the cocaine again. That night, Nicole

saw Push with a nine millimeter black gun. (Tr. III, 261.) Nicole testified that she did not see Petitioner sell any drugs or possess a gun. (Tr. III, 262.) The next morning, Tasha and Nicole were outside while Petitioner was looking for his keys. (Tr. III, 262-63.) Nicole testified that Push locked the keys in Petitioner's trunk, took most of the "dope" and some money, and left the gun in Petitioner's car. (Tr. III, 263.)

On cross-examination, Nicole testified that Push was in the motel room when the police officers arrived. (Tr. III, 268.) Nicole disagreed with the officers' testimony that they could not see the car from the front of the motel. (Tr. III, 269-70.) Nicole saw Push take some of the cocaine and money from Petitioner's car. (Tr. III, 268.) Nicole testified that she saw Push put the gun in the trunk of Petitioner's car. (Tr. III, 272.) She also saw him place the remaining cocaine in the front passenger seat. (Tr. III, 272, 280.) Nicole testified that Push left the cocaine in Petitioner's car to set Petitioner up. (Tr. III, 280-81.) Nicole admitted that she was a prostitute and crack cocaine user. (Tr. III, 275.) She noted that dealers would sell cocaine to get as much money as they could possibly get for the cocaine. (Tr. III, 277.)

Petitioner testified next for the defense. (Tr. III, 289.) Petitioner first ran into Tasha Isenhart because she was waving him down on Division Street. (Tr. III, 291-92.) They partied for three or four days, drinking alcohol and smoking crack cocaine. (Tr. III, 292-93.) On July 31, Petitioner and Tasha saw Nicole Paulsen outside of a restaurant. (Tr. III, 293.) Nicole asked to hang out with Tasha and Petitioner. (Tr. III, 294.) Tasha, Nicole and Petitioner drove around until they picked up Push and bought alcohol. (Tr. III, 295, 297.) On July 31, Petitioner, Push, Nicole and Tasha got high and drunk at the motel. (Tr. III, 297, 319-20.) Both of the girls had some crack cocaine but they eventually ran out. (Tr. III, 319-20.) Petitioner gave them some more money and

his car keys to get more crack cocaine. (Tr. III, 320-21, 323.) Petitioner spent almost $1,200.00 to get high. (Tr. III, 317.) Petitioner testified that he was paying for the party with the $4,526.00 that he received from his mother for social security approximately ten days prior to this incident. (Tr. III, 298-99, 307, 317.) Petitioner eventually fell asleep. (Tr. III, 299.) When Petitioner woke up the next morning, he found Tasha and Nicole in the room. Petitioner tried unsuccessfully to locate the keys to his car. (Tr. III, 300.) Petitioner then went to the lobby and asked them to call a tow truck because his car was locked. (Tr. III, 302.)

While the front desk called for the tow truck, Petitioner noticed two police officers talking to Nicole and Tasha outside. (Tr. III, 302.) Petitioner became nervous because he was on parole, high and with two prostitutes. (Tr. III, 302-03.) Petitioner went to his car with an employee to open the car but they were unsuccessful. Petitioner then headed back to the lobby. (Tr. III, 303.) When the tow truck arrived, Petitioner rode with the tow truck driver to his car. The tow truck driver opened the car door and the trunk to Petitioner's car. Petitioner found his keys in the trunk. (Tr. III, 305.) Petitioner then walked to the lobby where an officer asked if he could search Petitioner's car. Petitioner refused. (Tr. III, 306.) After calling his parole officer, Petitioner left the motel and ran. (Tr. III, 307.) Petitioner testified that he ran away from the police because he was on parole and high. (Tr. III, 325-26.) Petitioner admitted that getting high and associating with a prostitute are parole violations. (Tr. III, 337.) Petitioner, however, denied selling drugs to anyone or possessing a firearm. (Tr. III, 308-09.) Petitioner stated that he had a cell phone because he had to contact a drug program everyday. (Tr. III, 328.)

Detective Kent Cooper testified next for the defense. (Tr. IV, 343.) Officer Cooper stated that it was possible to spend $1,000.00 in four days on drugs. (Tr. IV, 344.) On cross-

examination, Detective Cooper clarified that the gun was a silver .32 caliber gun. Nicole Paulsen, however, described Push's gun as a black revolver in her testimony. (Tr. IV, 347.)

At the conclusion of the trial, on March 15, 2002, the jury found Petitioner guilty of possession with intent to deliver less than 50 grams of cocaine and carrying a concealed weapon. (Tr. IV, 427-28.) On June 6, 2002, Petitioner was sentenced to serve prison terms of 6 to 40 years for the drug conviction and 3 to 20 years for the carrying a concealed weapon conviction as a fourth habitual offender. (Sentencing Transcript (S. Tr.), 9, docket #14.)

B.    **Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals, raising the following six claims:

I.     DEFENDANT'S RIGHT TO A FAIR TRIAL WAS PREJUDICED BY INEFFECTIVE ASSISTANCE OF COUNSEL WHO MADE A SERIOUS MISTAKE IN FAILING TO CHALLENGE THE ILLEGAL SEARCH OF DEFENDANT'S VEHICLE AND SEIZURE OF THE COCAINE AND HANDGUN THAT RESULTED IN HIS CONVICTIONS AT TRIAL, WHERE THE SEARCH WAS NOT A VALID SEARCH INCIDENT TO ARREST OR INVENTORY SEARCH, BUT RATHER A PRETEXT SEARCH WITHOUT PROBABLE CAUSE.

II.    THE PROSECUTOR'S REPEATED ARGUMENT TO THE JURY AND ELICITATION FROM HIS WITNESSES THAT DEFENDANT WAS ON PAROLE DENIED DEFENDANT A FAIR TRIAL.

       A.    TRIAL COUNSEL MADE A SERIOUS MISTAKE IN FAILING TO OBJECT TO THIS ARGUMENT AND EVIDENCE OR MOVE FOR A MISTRIAL.

III.   DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS, WHERE THE PROSECUTOR'S ARGUMENT AND QUESTIONING ATTEMPTED TO ESTABLISH DEFENDANT'S GUILT OF THE INSTANT OFFENSE BY ASSOCIATION WITH PROSTITUTE DRUG-ADDICTS AND HIS PRESENCE IN AN AREA KNOWN FOR CRIME AND DRUG TRAFFICKING, AND INTERJECTED PURE HEARSAY TESTIMONY

AND REFERENCES TO ANONYMOUS TIPS TO SUPPORT HIS THEORY OF THE CASE RESULTING IN THE INTERJECTION OF IRRELEVANT AND INFLAMMATORY EVIDENCE AT TRIAL, AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO THE INTRODUCTION OF THIS EVIDENCE.

IV.    THE PROSECUTOR FAILED TO PRODUCE SUFFICIENT EVIDENCE TO SUSTAIN JURY VERDICTS OF GUILTY OF POSSESSION WITH INTENT TO DELIVER COCAINE AND [CARRYING A CONCEALED WEAPON] IN AN AUTOMOBILE.

V.    DEFENDANT WAS DENIED HIS RIGHT TO A FAIR TRIAL UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS BY THE INTENTIONAL PROSECUTORIAL MISCONDUCT, IN HIS IMPROPER AND HIGHLY PREJUDICIAL ARGUMENT TO THE JURY WHEN HE: VOUCHED FOR CREDIBILITY OF HIS WITNESSES, BOLSTERED THE VALIDITY OF HIS CASE; DENIGRATED THE DEFENDANT, HIS DEFENSE, AND DEFENSE WITNESSES; MIS[-]CHARACTERIZED THE EVIDENCE; ARGUED CIVIC DUTY AS A BASIS TO CONVICT, AND SHIFTED THE BURDEN OF PROOF TO DEFENDANT.

VI.    TRIAL COUNSEL MADE A SERIOUS MISTAKE IN FAILING TO INSURE THAT THE JURY WAS PROPERLY INSTRUCTED.

(Def.-Appellant's Br. on Appeal, docket #16.)   By unpublished opinion issued on May 6, 2004, the

Michigan Court of Appeals rejected all of Petitioner's appellate arguments except for his claim that

Petitioner received the ineffective assistance of trial counsel when counsel failed to move for a new

trial or a *Ginther*[1] hearing on the constitutionality of the search of Petitioner's automobile.  The

Michigan Court of Appeals remanded the case to the trial court for a *Ginther* hearing but otherwise

affirmed Petitioner's convictions and sentences.  (*See* May 6, 2004 Mich. Ct. App. Opinion (2004

MCOA Op.), docket #16.)

---

[1]*People v. Ginther*, 212 N.W.2d 922, 925 (Mich. 1973) (holding that a defendant who wishes to raise claims on appeal for which an evidentiary record has not been not adequately preserved should seek an evidentiary hearing in the trial court and, if necessary, file a motion for remand in the court of appeals to hold such hearing).

The trial court held a *Ginther* hearing on December 2, 2004. The trial court found the search of Petitioner's vehicle was reasonable under the Fourth Amendment, and, thus, Petitioner was not denied the effective assistance of counsel. The trial court also denied Petitioner's motion for a new trial. (Dec. 2, 2004 Post-Trial Motion Tr., 73-86, docket #15.)

On August 22, 2006, the Michigan Court of Appeals reviewed Petitioner's case a second time. The Michigan Court of Appeals rejected Petitioner's ineffective assistance of counsel claim based on the constitutionality of the search of his vehicle. The appellate court also affirmed Petitioner's convictions and sentences. (*See* Aug. 22, 2006 Mich. Ct. App. Opinion (2006 MCOA Op.), docket #17.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner brought the same claims raised before and rejected by the Michigan Court of Appeals in its May 6, 2004 Opinion and its August 22, 2006 Opinion. By order entered December 29, 2006, the Michigan Supreme Court denied Petitioner's applications for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Dec. 29, 2006 Mich. Order, docket #18.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant

to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

- 13 -

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

I.     **Vehicle Search:  Grounds I and II**

In his first and second grounds for habeas corpus relief, Petitioner challenges the constitutionality of the search of his car by the Grand Rapids police officers.  Besides arguing that the search was a violation of his Fourth Amendment rights, Petitioner argues that he was denied the effective assistance of counsel because counsel failed to file a motion to suppress the evidence seized from Petitioner's vehicle and to object to his arrest.

A.     **Illegal search and seizure:  Ground II**

Petitioner contends that the gun and drug evidence discovered by police officers in his car should have been suppressed because it was obtained in violation of his Fourth Amendment rights.  Petitioner's claim is barred by the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976).  *See also Queen v. Scroggy*, 99 F.3d 1302, 1332 (6th Cir. 1996) (noting that it is well-settled that *Stone v. Powell* bars Fourth Amendment claims).  In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the petitioner a full and fair opportunity to litigate the Fourth Amendment claim.  *Stone,* 428 U.S. at 494.

In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, then federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326 (6th Cir. 2001).

In the present case, Petitioner cannot satisfy either prong of the *Stone v. Powell* standard. First, it is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See People v. David*, 326 N.W.2d 485, 488 (Mich. Ct. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges.

Second, to satisfy the remaining prong of *Stone v. Powell*, Petitioner must allege facts showing that the state corrective mechanism has somehow broken down. *See Agee v. White*, 809 F.2d 1487, 1490 (11th Cir. 1987) (habeas review not barred when state appellate court completely ignored Fourth Amendment claim). The Sixth Circuit pointedly has held that the doctrine of *Stone v. Powell* applies, even if the federal court deems the state-court determination of the Fourth

Amendment claim to have been in "egregious error." *Gilbert*, 763 F.2d at 824 (citing *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982)).

Petitioner has not alleged any facts showing that the state's mechanism has broken down. Rather, it is clear that the Michigan courts gave Petitioner's Fourth Amendment claim full and proper consideration. The Michigan Court of Appeals reviewed Petitioner's application for leave to appeal and determined that it had merit. The appellate court then remanded Petitioner's case to the trial court for a *Ginther* hearing. At the *Ginther* hearing, the trial court found that the search of Petitioner's car was reasonable under the Fourth Amendment. The trial court also found that Petitioner did not receive the ineffective assistance of counsel for counsel's failure to file a motion to suppress the evidence. Petitioner then appealed to the Michigan Court of Appeals for a second time. The Michigan Court of Appeals concluded that the search of Petitioner's car and the seizure of the drugs and gun from the car were reasonable under the Fourth Amendment. The appellate court also affirmed the trial court's holding that Petitioner did not receive the ineffective assistance of counsel. Even if this Court were to disagree with the determination of the Michigan courts, that disagreement would be insufficient to satisfy the second prong of the Sixth Circuit standard. *See Gilbert*, 763 F.2d at 824. Because Petitioner has failed to demonstrate either prong of *Stone v. Powell*, his Fourth Amendment claim of illegal search and seizure is barred on habeas review.

In *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986), the Supreme Court held, as an exception to *Stone,* 428 U.S. 465, that a claim of ineffective assistance of counsel can permissibly include a claim that trial counsel failed to competently litigate an issue under the Fourth Amendment. *See also Joshua v. DeWitt*, 341 F.3d 430, 437 (6th Cir. 2003). Because Petitioner

- 17 -

asserts that his trial counsel was ineffective for failing to file a motion to suppress the drug and gun evidence obtained from his car under the Fourth Amendment, the Court will review Petitioner's ineffective assistance of counsel claim below.

B.      **Ineffective Assistance of Counsel: Ground I**

First, Petitioner argues that he received the ineffective assistance of counsel when his trial counsel failed to raise a Fourth Amendment challenge to suppress the drug and gun evidence obtained by police officers during the search of Petitioner's car. Second, Petitioner argues that his trial counsel rendered ineffective assistance of counsel for failing to object to his arrest.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). A court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error

had no effect on the judgment. *Id.* at 691. A claim of ineffective assistance of counsel presents a mixed question of law and fact. Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1). *See Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

### 1. **Vehicle Search**

Petitioner argues that he received the ineffective assistance of trial counsel when his attorney failed to file a motion to suppress gun and drug evidence under the Fourth Amendment after a search of Petitioner's car. As stated above, the Supreme Court in *Kimmelman* concluded that a petitioner was not barred by the doctrine of *Stone v. Powell* from bringing an ineffective assistance of counsel claim for counsel's failure to safeguard a petitioner's Fourth Amendment rights. *Kimmelman*, 477 U.S. at 383. To obtain habeas relief under *Kimmelman*, 477 U.S. at 383, the Supreme Court stated that a petitioner must not only prove both prongs of *Strickland*, but also "prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Kimmelman*, 477 U.S. at 375; *see also Young v. Renico,* 346 F. App'x 53, 57 (6th Cir. 2009). As a result, the Court will review the merits of Petitioner's Fourth Amendment claim first.

### a. *Ginther* Hearing

Following a remand from the Michigan Court of Appeals, the trial court held a *Ginther* hearing on December 2, 2004 to determine the merits of Petitioner's ineffective assistance of counsel claim based on his attorney's failure to file a motion to suppress the gun and drug evidence under the Fourth Amendment. At the *Ginther* hearing, Petitioner's trial counsel, Frederick Johnson, Jr., testified that he reviewed the police reports for Petitioner's case prior to the preliminary examination. (Dec. 2, 2004 Post-Trial Mot. Tr. (Ginther Tr.), 6, docket #15.) In those reports, Mr.

Johnson reviewed statements by anonymous employees at the motel that Petitioner offered to sell drugs at the motel. (Ginther Tr., 9, 13.) Mr. Johnson testified that the employees of the motel will often give information to the police about any criminal activities they observe at the motel. (Ginther Tr., 13.) Mr. Johnson noted that the motel was a preferred location for drugs and illegal sexual activity. (Ginther Tr., 9.) Mr. Johnson stated that he did not bring a motion to suppress the evidence from the search of Petitioner's vehicle because he thought the police performed an inventory search of Petitioner's car. (Ginther Tr., 8.) After Mr. Johnson's testimony, the trial court admitted the Grand Rapids Police Department Impound Inventory Policy (Policy) as an exhibit. (Ginther Tr., 15-16.)

Officer Scott Stormer also testified at the *Ginther* hearing. Officer Stormer ran into two known prostitutes and cocaine addicts outside the Landmark Motel. The prostitutes were waiting for a ride from Petitioner, who had inadvertently locked the keys in his car. After Petitioner left with a tow truck driver to open his car, Officer Stormer ran a LEIN check on Petitioner and determined that Petitioner was on parole. (Ginther Tr., 18-19.) Officer Stormer learned that because Petitioner was associating with a prostitute at the motel, Petitioner was in violation of his parole. (Ginther Tr., 24)

Two anonymous employees of the Landmark Motel provided Officer Stormer with pertinent information about Petitioner. One employee stated that Petitioner tried to sell him acid. (Ginther Tr., 22-23.) Another employee said that Petitioner attempted to give him the car keys to his car because Petitioner had a gun in the car. Officer Stormer was familiar with both employees because he had received information from them in the past. To the best of his knowledge, Officer Stormer had never received false information from those employees. (Ginther Tr., 23-24.)

The police officers attempted to arrest Petitioner because of his parole violation. After a short pursuit, Officer Stormer arrested Petitioner. During the arrest, Officer Stormer found Petitioner's car keys near Petitioner's groin. Officer Stormer also found a few thousand dollars in Petitioner's pocket. (Ginther Tr., 27-28.) The police officers then searched Petitioner's car. Officer Stormer testified that he searched the car because of the information from the employees of the motel about the drugs and gun. (Ginther Tr., 28.) Even if he had not received the information from the employees of the motel, Officer Stormer would still have impounded Petitioner's car after his arrest. Officer Stormer testified that the motel did not want any cars on their property after a driver had been arrested. (Ginther Tr., 29.) Because Officer Stormer's supervisor wanted the canine unit to search Petitioner's car, he inventoried the car before impounding it. (Ginther Tr., 28-29.) Petitioner's car was then taken to the impound lot. The motel was in a high crime area. (Ginther Tr., 29.) Officer Stormer testified that he also would have brought Petitioner's car in for safe-keeping because there was a risk of damage to the car. (Ginther Tr., 30.) While the Policy also permits relatives to remove a car, Officer Stormer testified that he would not have allowed Petitioner's relatives to move Petitioner's car because Officer Stormer was ordered to place a hold on the car by his supervisor. (Ginther Tr., 30.)

b.       State Court Decisions

The trial court issued an opinion at the December 2, 2004 *Ginther* hearing. Besides denying Petitioner's motion for a new trial, the trial court rejected Petitioner's ineffective assistance of counsel claim. The trial court found that the search by the police officers was constitutional under the "automobile" and the "impound and inventory" exceptions to the Fourth Amendment warrant requirement. (Ginther Tr., 80-86.)

The Michigan Court of Appeals affirmed the decision of the trial court, stating that the police officers had probable cause to search Petitioner's car pursuant to the "automobile" exception and the "impound and inventory" exceptions to the Fourth Amendment warrant requirement. The Michigan Court of Appeals first analyzed the "automobile" exception to the Fourth Amendment warrant requirement, as follows:

> The Fourth Amendment to the United States Constitution and the Michigan Constitution protect against unreasonable government intrusions by requiring the police to obtain a warrant before conducting a search or seizure. *People v Taylor*, 253 Mich App 399, 403; 655 NW2d 291 (2002). The remedy for a Fourth Amendment violation is suppression of evidence confiscated as the result of an unconstitutional search. *People v Cartwright*, 454 Mich 550, 558; 563 NW2d 208 (1997). "Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions." *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996). Two of those exceptions are relevant to this appeal: (1) the automobile exception, and (2) the impound and inventory search.
>
> If a car is readily mobile and probable cause exists to believe it contains contraband, the police are permitted under the Fourth Amendment to search the car, its compartments, and any containers within it without a warrant. *Maryland v Dyson*, 527 US 465, 467; 119 S Ct 2013; 144 L Ed 2d 442 (1999); *People v Carter*, 194 Mich App 58, 61; 486 NW2d 93 (1992). In order for the automobile exception to apply there must be probable cause to support a search. The determination whether probable cause exists should be made in a commonsense manner in light of the totality of the circumstances. *People v Garvin*, 235 Mich App 90, 102; 597 NW2d 194 (1999). Probable cause requires a fair probability that contraband or evidence of a crime will be found in a particular place. *Id.* Probable cause may be based on information from an informant, named or unnamed, if it is shown that the informant spoke from personal knowledge, and (a) the informant is credible, or (b) the information is reliable. MCL 780.653; *People v Hall*, 158 Mich App 194, 198; 404 NW2d 219 (1987). In determining whether probable cause existed justifying a search or seizure, the court must examine a police officer's observations in light of her experience and training, not in a vacuum or from a hypertechnical perspective. *People v Levine*, 461 Mich 172, 185; 600 NW2d 622 (1999).
>
> The two informants that spoke with the police had provided the officer with reliable information many times in the past. The officer was familiar with both employees and had no reason to doubt the veracity of their statements. The tip from a hotel employee known to be reliable in the past, concerning the gun in the car

provided a basis to enable "a person of reasonable prudence" to believe that evidence of a crime or contraband was in a particular place. *People v Sinistaj*, 184 Mich App 191, 200; 457 NW2d 36 (1990). This tip became even more substantial when defendant was arrested and police discovered that he had removed his car keys from his key chain and put them down his pants. The police could reasonably infer that defendant did not want anyone easily accessing the vehicle. Looking at the totality of the circumstances from the officer's trained perspective, we find that the officers had probable cause to search the car. The two tips from reliable sources, the car keys being removed from the key chain and hidden, defendant being in the company of known prostitutes, and defendant already being on parole for drug related offenses established probable cause to believe that contraband was in the vehicle.

(2006 MCOA Op. at *2-3, docket #17.)

The Michigan Court of Appeals also determined that the search was constitutional under the "impound and inventory" exception to the Fourth Amendment warrant requirement:

Additionally, this search was also constitutional under the inventory exception to the warrant requirement. This exception requires that an impoundment of a vehicle and search be conducted in accordance with established departmental policy that limits the discretion of an individual officer and makes the impoundment primarily a matter of policy. *People v Green*, 260 Mich App 392, 410-411; 677 NW2d 363 (2004). The search must be conducted pursuant to standardized police procedures and must not be used as a pretext for criminal investigations. *Id.* at 412-413. "The goal is to prevent inventory searches from being used as a 'ruse for general rummaging in order to discover incriminating evidence.'" *People v Poole*, 199 Mich App 261, 265-266; 501 NW2d 265 (1993). "A number of courts have recognized that the possibility of theft or vandalism is a valid reason for impounding a car upon the arrest of the driver, especially where no other person is present to take control of the car." *People v Krezen*, 427 Mich 681, 687-688; 397 NW2d 803 (1986).

It is necessary to look to the impoundment policy of the Grand Rapids Police Department, to determine whether the impoundment and subsequent inventory search of defendant's vehicle was constitutionally valid. *Green, supra*. That policy provides that, when a driver is arrested and his vehicle is left unattended in a location that would constitute a traffic hazard or is highly susceptible to damage or theft, the police shall impound the vehicle. It also states that "[a]ll vehicles removed by the Grand Rapids Police Department for impound, evidence, or safekeeping shall be inventoried." Although no inventory report was presented, an officer testified that one was completed, but subsequently thrown away as was the practice after one or two years.

Here, the car was left in a high crime area and would not have been safe if left unattended. The motel, where the car was parked, had requested in the past that cars be removed when the owner was arrested. Using their discretion, the police could have reasonably concluded that the other people who were with defendant at the time of his arrest, were not responsible persons for the purposes of taking possession of the car. Additionally, even had there been other options regarding how to handle the vehicle, the officers would not have been obligated to choose them. Our Supreme Court has determined that the police acted reasonably when they decided to impound an arrested person's vehicle pursuant to standard procedures, even though there was an ability to exercise discretion to do something else with the vehicle. *See People v Toohey*, 438 Mich 265, 285; 475 NW2d 16 (1991). *See also Colorado v Bertine*, 479 US 367, 374; 107 S Ct 738; 93 LEd2d 739 (1987).

(2006 MCOA Op. at *3-4.) The Michigan Court of Appeals therefore concluded that Petitioner's counsel was not ineffective for failing to file a motion to suppress the gun and crack cocaine evidence in the trial court under the Fourth Amendment:

The search of the car was constitutional, and therefore, defendant was not denied the effective assistance of counsel by his attorney's failure to move for suppression of the evidence. An attorney need not make meritless motions. *People v Traylor*, 245 Mich App 460, 463; 628 NW2d 120 (2001).

(2006 MCOA Op. at *4.)

c.     Analysis

The court of appeals' decision was a reasonable application of established Supreme Court precedent for the search of automobiles under two separate grounds: the "automobile" exception and the "impound and inventory" exception to the Fourth Amendment warrant requirement.

The Court will first analyze Petitioner's Fourth Amendment claim under the "automobile" exception to the warrant requirement. The Fourth Amendment protects against unreasonable search and seizures. U.S. Const. amend. IV. This right is enforced by requiring police officers to obtain a warrant prior to conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466

(1999) (citing *California v. Carney*, 471 U.S. 386, 390-91 (1985)). However, the Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles. *Maryland*, 527 U.S. at 466 (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). Under the "automobile" exception, police officers may conduct a warrantless search of a vehicle if the vehicle is mobile and they have "probable cause" to believe that the vehicle contains contraband. *Maryland*, 527 U.S. at 467. Probable cause is defined as " reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Smith,* 510 F.3d 641, 647-48 (6th Cir. 2007) (internal quotation marks omitted). The existence of probable cause must also be determined using a "totality of the circumstances" test; that is, the question is whether, given all of the facts known to the police officer, there is a fair probability that contraband or evidence will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause may also come from "a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998).

Here, the police officers had reasonable grounds to believe that Petitioner's vehicle contained contraband. The motel was a well known location for drug trafficking and illegal sexual activity. Indeed, Petitioner was associating with two well-known prostitutes and cocaine addicts before he was arrested on a parole violation. (Ginther Tr., 18.) When Officer Stormer arrested Petitioner, he found Petitioner's car keys stuffed down Petitioner's pants in an apparent attempt to conceal them. Petitioner was also carrying a large amount of cash. (Ginther Tr., 27-28.)

Two of the employees of the motel provided Officer Scott Stormer with confidential information about Petitioner's alleged criminal activities at the motel. The confidential informants

provided Officer Stormer with the following detailed information about Petitioner, which Officer Stormer corroborated in his investigation. *See Lumpkin*, 159 F.3d at 986. One employee mentioned that Petitioner tried to sell him acid. (Ginther Tr., 22-23.) Another employee stated that Petitioner attempted to give him his car keys because Petitioner had a gun in the car. (Ginther Tr., 23.) Officer Stormer corroborated the tips by confirming that Petitioner was the only non-employee in the lobby at the time of those two events. (Ginther Tr., 35-37.) Officer Stormer also found the confidential informant information reliable in the past. (Ginther Tr., 23-24.)

Considering the totality of the circumstances, including the tips from the confidential informants, probable cause existed to search Petitioner's automobile for contraband. Moreover, Petitioner testified at trial that he drove his vehicle, and, thus, the car was mobile. *See Maryland*, 527 U.S. at 467 (finding police officers may conduct a warrantless search of a vehicle under the "automobile" exception if the vehicle is mobile and they have "probable cause" to believe that the vehicle contains contraband.) Therefore, Petitioner's Fourth Amendment claim fails on the merits under the "automobile" exception to the warrant requirement.

Even if the search of Petitioner's vehicle was an unreasonable search and seizure under the "automobile" exception, Petitioner's Fourth Amendment claim still fails under the "inventory and impoundment" exception to the warrant requirement. An inventory search of a police-impounded automobile is a recognized exception to the warrant requirement. *See Colorado v. Bertine*, 479 U.S. 367 (1987). Such inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Bertine*, 479 U.S. at 372. An inventory search may not be conducted for purposes of investigation and must be conducted according to standard police

procedures. *See Florida v. Wells*, 495 U.S. 1, 5 (1990).  However, the fact that an officer suspects that contraband may be found does not defeat an otherwise proper inventory search.  *See United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994).

In this case, the Policy provides, in pertinent part, "[o]fficers shall impound . . . [o]r remove a vehicle when the driver [is] arrested and the vehicle is left unattended in a location which would constitute a traffic hazard or is highly susceptible to theft - - damage or theft."  (Ginther Tr., 80.)   It also states that "[a]ll vehicles removed by the Grand Rapids Police Department for impound, evidence, or safekeeping shall be inventoried."  (Ginther Tr., 40-41.)  At the *Ginther* hearing, Petitioner argued that the Policy provides an alternative to vehicle impoundment, mainly that a responsible person with a valid driver's license may assume responsibility of the car and its contents.  (Ginther Tr., 81.)

Officer Stormer's supervisor requested that Petitioner's car be impounded after Petitioner's arrest.  The Policy directs officers to impound a vehicle when a driver is arrested and the car is highly susceptible to damage or theft.  (Ginther Tr., 80.)  Officer Stormer arrested Petitioner.  (Ginther Tr., 26-27.)  Petitioner's attorney and Officer Stormer both testified that the area around the motel was a high crime area.  (Ginther Tr., 9, 29.)  Officer Stormer stated that the car would not have been safe if he had left it in the parking lot.  (Ginther Tr., 30.)  Because the car was susceptible to damage in the motel's parking lot, Officer Stormer impounded Petitioner's vehicle.  After the car was impounded, Officer Stormer testified that he prepared an inventory report but the records department eventually destroyed the report.  (Ginther Tr., 40.)  Because Officer Stormer followed the Policy, the inventory search was proper.  Officer Stormer was not obligated to turn over Petitioner's vehicle to another individual even if there was a responsible person to take

possession of the car at the time of Petitioner's arrest. *See Bertine*, 479 U.S. at 375-76 (police officers may exercise discretion between impounding a van and parking and locking it in a public parking place as long as it is according to standard criteria.) Petitioner therefore fails to raise a Fourth Amendment claim.

Because the police officers had reason to perform a warrantless search of Petitioner's car under the "automobile" exception and the "impound and inventory" exception to the Fourth Amendment warrant requirement, the gun and crack cocaine evidence was not obtained in violation of Petitioner's Fourth Amendment rights. Consequently, counsel's failure to move to suppress that evidence was within "the wide range of professionally competent assistance," and, thus, was not a violation of the Supreme Court's decision in *Strickland*. *See Strickland,* 466 U.S. at 690. Counsel's failure to make a frivolous or meritless motion does not constitute the ineffective assistance of counsel. *See Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *A.M. v. Butler*, 360 F.3d 787, 795 (7th Cir. 2004); *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *United States v. Wright*, 573 F.2d 681, 684 (1st Cir. 1978). Therefore, the Michigan Court of Appeals' rejection of Petitioner's claim of ineffective assistance of counsel constituted a reasonable application of established Supreme Court precedent under *Strickland*.

2.      **Arrest**

Petitioner argues that he was denied the effective assistance of counsel because trial counsel failed to argue that his arrest was invalid.[2]  Because the Michigan Court of Appeals did not address Petitioner's argument, this Court will conduct a *de novo* review of Petitioner's claim.  *See McKenzie*, 326 F.3d at 727.

Officer David Lilly testified that Petitioner's parole agent authorized Petitioner's arrest on August 1, 2001 because Petitioner was registered at the Landmark Motel with a prostitute, Nicole Paulsen.  (Tr. II, 113-14.)  Detective Kent Cooper verified that Petitioner and Nicole Paulsen were registered together at the motel.  (Tr. III, 187.)  Nicole Paulsen testified that she was a prostitute.  (Tr. III, 275.)  In his testimony, Petitioner acknowledged that associating with a prostitute was a violation of his parole.  (Tr. III, 337.)   Petitioner testified that he drank and got high with Nicole Paulsen at the motel.  (Tr. III, 297.)  Petitioner violated the conditions of his parole by associating with Nicole Paulsen, a prostitute, which ultimately led to his arrest.  Accordingly, any argument by his trial counsel would have been frivolous.  Counsel is not required to make a frivolous argument under *Strickland*.  *See Chegwidden*, 92 F. App'x at 311; *Butler*, 360 F.3d at 795; *James*, 24 F.3d at 27; *Koch*, 907 F.2d at 527; *Wright*, 573 F.2d at 684.  Therefore, this habeas claim lacks merit.

II.      **Prosecutorial Misconduct: Ground III**

In his third ground for habeas corpus relief, Petitioner argues that the prosecutor violated his due process rights when the jury was informed that Petitioner was on parole in the

---

[2]It is not clear whether Petitioner properly exhausted this ineffective assistance of counsel claim. Regardless, this Court may decide the claim on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

prosecutor's opening statement, during the prosecutor's direct- and cross-examination of witnesses and in the prosecutor's closing argument.[3]  (Pet. at 9, docket #1.)  Petitioner also alleges that he was denied the effective assistance of counsel because counsel failed to object to the prosecutor's misconduct.  (*Id.*)

Petitioner complains of the references to his parole in the following opening statement by the prosecutor:

> *In the process of having contact with the LEIN system, they learned that [Petitioner] was on parole[,] which heightened their interest because they subsequently learned that [Petitioner] was registered along with one of these two women in room 412 at this Landmark Motel.*

> In the process of their investigation, an employee came up and gave them a tip with regard to [Petitioner].  *They proceeded with their investigation and, Officer Stormer, now thinking, wait a minute.  I got a tip.  I've got the fact that he's on parole and he's registered to a known prostitute in room 412 at this den of inequity.*  At that point[,] they decide we might have a problem here.

> \* \* \*

> Officer Stormer, armed with the information that he had, the suspicious circumstances, contacted the parole agent of [Petitioner] at that time, Mr. Logan, who was the person they had contact with and, based on the information provided to Mr. Logan by the officers, Mr. Logan authorized the arrest of his parolee, *[Petitioner], based on all these circumstances; i.e., he's registered in a room with a known prostitute, which is something you're not supposed to do while you're on parole.*

> \* \* \*

---

[3]Respondent contends that Petitioner's claims of prosecutorial misconduct are procedurally defaulted because Petitioner did not object to any of the alleged instances of prosecutorial misconduct.  (Resp't's Answer at 15-18, docket #7.)  Respondent is incorrect.  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  The Michigan Court of Appeals did not enforce the state procedural rule; therefore, Petitioner's claims of prosecutorial misconduct were not procedurally defaulted.

> *[Officer Stormer] made contact with [Petitioner]. Told him that he was placing him under arrest for this parole problem,* and essentially a struggle took place with [Petitioner] and Officer Duke, and [Petitioner] took off running.

(Def.-Appellant's Br. on Appeal, 16-17, docket #16 ) (citing Tr. II, 81-83) (emphasis in original.)

Petitioner also argues that the prosecutor's direct examination of Officers Scott Stormer, David Lilly and Michael Duke regarding Petitioner's parole status violated his due process rights. The prosecutor first questioned Officer Stormer about Petitioner's parole violation, in pertinent part, as follows:

Q    So what happened at that point?

A    At that point, Officer Duke arrived to transport Ms. Isenhart and Officer Lilly to the court. *I ran a check on [Petitioner] and found out he was on parole. While I was waiting for the conditions of the parole to come back, I received some information on [Petitioner] that kind of heightened my senses. So I got on my bike and rode around to the 400 building to see what car [Petitioner] was trying to get into.*

* * *

A    [Officers Lilly and Duke] came back. *I explained to Officer Lilly that [Petitioner] was on parole, explained about the information I received, and Officer Lilly and Officer Duke went around to the 400 building to secure the car, make sure nobody got in, nobody got out, nobody drove it away.*

Q    What happened next?

A    *I asked [Petitioner] - I told him I knew he was on parole, asked [Petitioner] if we could look into it, into the car. He said he didn't want us in the car. He would like us to talk to his parole officer, and I said [that] we were on the phone with the parole officer right now, but you can go ahead and call. So he walked into the lobby, and I'm assuming picked up the phone to call his parole officer because that's what he told me he was going to do.*

Q    What were you doing at that time?

A    *At that time[,] I was still waiting for information to come back from radio on his parole conditions, and I was standing there. Ms. Paulsen was still standing outside.*

- 31 -

* * *

Q   Please continue.  After you radioed in and you had asked [Petitioner] --

A   Correct. [Petitioner] was inside making this telephone call.  While he was inside, I received more information from an anonymous person –

Q   Employee?

A   Correct – about [Petitioner] and the automobile.  So I felt that I should contact Officer Duke and Officer Lilly about that.  I couldn't pick – I just called.  We both had department issue cell phones.  *Officer Lilly was on his phone to [Petitioner's] parole officer, so I couldn't contact him on [the] phone and couldn't raise him on [the] radio.*  So I got on my bike and biked over there to tell them what – the information I had gotten.

Q   To the 400 building?

A   Correct.

Q   What happened?

A   *At that time[,] Officer Lilly I believe was given the go ahead by the parole officer to arrest [Petitioner] because he was registered to the room with Nicole Paulsen, who is a known prostitute.*  So Officer Duke, who was in the car, went to the front of the building to make contact with [Petitioner] and arrest him.  When he got there, [Petitioner] was gone and so was Nicole Paulsen.

(Def.-Appellant's Br. on Appeal, 17-19) (citing Tr. II, 92-97) (emphasis in original.)

The prosecutor also questioned Officer Lilly about Petitioner's parole violation, in pertinent part, as follows:

Q   What happened at that time?

A   *Officer Stormer had alerted us to information that he had been provided about [Petitioner] and, again, the relationship between the two.  I attempted to notify a police officer for [Petitioner], and I think initially [Officer Stormer] had checked to find out – do some checking on him to find out if he was on parole, and he was indeed, and I spoke with his parole officer.*

Q    At some point – Officer Stormer testified actually he found out that, in fact, [Petitioner] and Ms. Paulsen were registered at the motel.

A    That is correct.

Q    Armed with that, did you have contact with Mr. Hogan, the parole officer for [Petitioner]?

A    I did.

Q    What happened?

A    *I spoke with Mr. Hogan, was able to verify a relationship between him and Ms. Paulsen because they had registered at the location in the same room, and he authorized his arrest by telephone.*

* * *

Q    What happened at that point?

A    Things started to pick up a little bit. *We already confirmed through Mr. Hogan that he was arrestable.* I believe that prior to this [Officer Scott Stormer] was trying to get in touch with me, but I was on the phone, and we went to effect the arrest and found that [] at some point during our conversation[,] [Petitioner] had left the scene.

(Def.-Appellant's Br. on Appeal, 19-20) (citing Tr. II, 113-15) (emphasis in original.)

The prosecutor then questioned Officer Michael Duke about Petitioner's parole violation as follows:

A    I picked up a female already under arrest and placed her in my cruiser, and [Petitioner] was present at that location although I had no dealings with him at that time and left that location westbound on 28th Street, *and then I turned northbound on Division to head towards the jail, and Officer Stormer radioed on the radio to me that [Petitioner], the black male that was there at the scene, is arrestable for a parole violation, and that if I made contact with him to arrest him, and I was advised by Officer Stormer to use extra caution because he's been known to carry a weapon . . . .*

(Def.-Appellant's Br. on Appeal, 20) (citing Tr. III, 192) (emphasis in original.)

- 33 -

The prosecutor cross-examined Petitioner extensively about his parole status, and how his activities violated his parole conditions. (Def.-Appellant's Br. on Appeal, 20) (citing Tr. III, 309-25.)

In closing arguments, the prosecutor also made a few references to Petitioner's parole violation, as follows:

> Once [Officer Stormer] realizes that there is a problem here and that [Petitioner] is in terms of his parole in violation – of course, [Petitioner] has now gone into the [M]otel - he decides to have [Petitioner] arrested . . . .

> [A]t that point when the officers make contact and say to [Petitioner], do you mind if we search your car – he's as innocent as the driven snow like he wants you to believe, that he's nothing but a poor crack user, why doesn't he let them do it? Why? He's got nothing to hide in that car. Sure he's on parole. They already see him with the two prostitute[s], but why doesn't he let them search [his] vehicle?

> * * *

> After the officers – Officer Stormer specifically, after talking to the LEIN or checking the LEIN, having radioed back to him, after getting these tips, this man's in violation of his parole.

> They call[ed] back Officer Duke. What has [Petitioner] done in the meantime? He [skedaddled] . . . because he was on parole and they were going to arrest him for this parole violation . . . .

(Tr. IV, 356, 359-60.)

The Michigan Court of Appeals rejected Petitioner's claims on the merits, as follows:

> We reject defendant's claims that the prosecution arguments, and defense counsel's inaction, deprived him of a fair trial where the jury was informed that he was on parole, . . . . While all of this testimony would ordinarily be objectionable, here counsel's defense was that defendant had participated in "partying" with the women, even in using illegal substances, but that there was no buying or selling of drugs involved. We find no prosecutorial misconduct and no ineffective assistance of counsel.

> * * *

Lastly, we conclude that any prejudice from the prosecutor's closing argument could have been cured by a timely objection and that, even if improper, the arguments did not affect the outcome of the trial.

(2004 MCOA at *4-5, docket #16.)

Petitioner claims that the admission of other acts evidence, i.e. his status as a parolee and his parole violation, by the prosecutor violated his right to a fundamentally fair trial under the Due Process Clause.[4] The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)). Under the AEDPA, however, this Court's review is limited to whether the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

There is no clearly established Supreme Court precedent, which holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due

---

[4]In Petitioner's brief to the Michigan Court of Appeals, Petitioner claims that the testimony of Petitioner's parole status and violation was highly prejudicial because it influences the jury to believe that Petitioner has a propensity towards bad acts under Michigan Rule of Evidence 404(b). (Def.-Appellant's Br. on Appeal, 16-26, docket #16.) To the extent Petitioner raises a claim under Michigan Rules of Evidence 404(b), his claim is not cognizable on habeas review. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has also found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Therefore, the Michigan Court of Appeals' decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

Petitioner's claim of ineffective assistance of counsel also fails. Petitioner alleges that he was denied the effective assistance of trial counsel when counsel failed to object to the prosecutor's misconduct. Because the references to Petitioner, as a parolee and violating his parole, were necessary to the historical background of the case, any objection by counsel would have been rejected by the trial court. Petitioner therefore fails to overcome the strong presumption that counsel's actions were within "the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689. As counsel's performance was reasonable, Petitioner also cannot demonstrate prejudice under *Strickland*. *Id.* at 687. Therefore, Petitioner's ineffective assistance of counsel claim lacks merit.

III.    **Sufficiency of the Evidence: Ground IV**

In his fourth ground for habeas corpus relief, Petitioner argues that he is entitled to habeas corpus relief because the prosecution presented insufficient evidence to support his

convictions for possession with intent to deliver less than 50 grams of a controlled substance and carrying a concealed weapon.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

## A.    **Drug Possession**

Petitioner was convicted of possession with intent to deliver less than fifty grams of a controlled substance, Mich. Comp. Laws § 333.7401(2)(a)(iv).  The elements of Mich. Comp. Laws § 333.7401(2)(a)(iv) are:  (1) Petitioner knowingly possessed a controlled substance; (2) Petitioner intended to deliver the substance to someone else; (3) Petitioner knew the substance was cocaine; and (4) the substance weighed less than 50 grams.  *See People v. Wolfe*, 489 N.W.2d 748, 752 (Mich. 1992).  Possession may be either actual or constructive, and may be joint or exclusive.  *Id.* at 753.  The controlling question is whether the defendant had dominion or control over the controlled substance.  *People v. Konrad*, 536 N.W.2d 517, 521 (Mich. 1995).  Circumstantial evidence and

reasonable inferences arising from the evidence may suffice to establish possession. *People v. Fettered*, 583 N.W.2d 199, 202 (Mich. 1998). To prove intent to deliver, proof of actual delivery of narcotics is not required. Intent to deliver may be inferred from the quantity of narcotics in a defendant's possession, from the way in which those narcotics are packaged, and from other circumstances surrounding the arrest. *See Wolfe*, 489 N.W.2d at 755.

The Michigan Court of Appeals rejected Petitioner's claim as follows:

> Next, we reject defendant's claim that the evidence was insufficient to sustain his conviction. If the evidence found in the car is admissible, it was sufficient to support a conclusion that the cocaine belonged to defendant, in whose jacket it was located, and, given the quantity involved, and the amount of money defendant was carrying, that defendant possessed it with an intent to deliver. The trier of fact was not obliged to accept the testimony of one of the women that the cocaine belonged to her.

(2004 MCA Op. at 5, docket #16.) The appellate court's decision is entitled to deference unless that decision was contrary to or an unreasonable application of the Supreme Court's decision in *Jackson*.

The prosecution provided ample evidence to convict Petitioner of possession with intent to deliver less than fifty grams of a controlled substance. After Officer Stormer arrested Petitioner, he searched Petitioner. (Tr. II, 97-98.) Officer Stormer found approximately $3,300.00 in Petitioner's pocket and a cell phone. He also located the keys to Petitioner's car hidden near Petitioner's groin. (Tr. II, 98-99.) Officers Stormer and Lilly then searched Petitioner's car.[5] (Tr. II, 100.) During the search of Petitioner's vehicle, Officer Lilly testified that he found drugs in Petitioner's jacket in the trunk of his car. Officer Stormer also found a gun under the driver's side car seat. (Tr. II, 116-18.) As Petitioner may exercise control over his jacket and car, a rational jury could infer that he possessed the crack cocaine found in his jacket in the trunk of his car.

_____

[5]As discussed in Section I (A), the drug evidence found in Petitioner's car was admissible.

The seized evidence was sent to Dale Gooden of the Michigan State Police to be tested and weighed. Gooden stated that he found cocaine present in the evidence. Gooden further testified that the drugs weighed 9.15 grams. (Tr. II, 142, 144.) Officer Stormer testified that Petitioner yelled from the patrol car that the crack cocaine was Tasha Isenhart's. (Tr. II, 102.) Obviously, Petitioner knew the substance was cocaine. Further, the substance satisfied the weight requirement.

Detective Kent Cooper testified that drug traffickers typically possess cell phones and large quantities of drugs and cash. (Tr. II, 152, 154.) Detective Cooper also mentioned that 9.15 grams was sufficiently large enough supply to be typical of a drug dealer. (Tr. II, 162.) The large amount of crack cocaine found in Petitioner's car, the large amount of cash and cell phone on Petitioner and the gun in Petitioner's car all provide evidence for a rational jury to conclude that Petitioner intended to deliver the crack cocaine to someone else.

The fact that Tasha Isenhart claimed that the cocaine was hers is not dispositive. The *Jackson* standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. Issues of credibility may not be reviewed by the habeas court under this standard. *Id.* at 326 (habeas court may not reject jurors' verdict simply because the evidence does not "rule out every hypothesis except that of guilt beyond a reasonable doubt"); *see also Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Therefore, the trier of fact was in the best position to weigh Tasha Isenhart's testimony against the evidence in this case. Because the jury convicted Petitioner of possession with intent to deliver less than fifty grams of a controlled substance, the jury must have determined that Tasha's testimony was not credible.

As there was sufficient evidence to convict Petitioner of possession with intent to deliver less than fifty grams of a controlled substance under *Jackson*, the Court concludes that Petitioner is not entitled to habeas relief on this claim.

B.      **Carrying a Concealed Weapon**

Petitioner argues that he was wrongly convicted of carrying a concealed weapon in a motor vehicle, Mich. Comp. Laws § 750.227.  The elements of carrying a concealed weapon in a motor vehicle are:  (1) the presence of a weapon in a vehicle operated or occupied by the defendant, (2) the defendant's knowledge that the weapon is present, and (3) the "carrying" of a weapon.  *People v. Nimeth*, 601 N.W.2d 393 (Mich. Ct. App. 1999).  To substantiate the element of "carrying," the defendant's awareness of the weapon was cited as one factor which has been considered to determine whether there is sufficient circumstantial evidence. *People v. Butler*, 319 N.W.2d 540, 545 n.11 (Mich. 1982).  Additional factors include: (1) the accessibility or proximity of the weapon to the person of the defendant; (2) the defendant's possession of items which connect him to the weapon, such as ammunition; (3) the defendant's ownership or operation of the vehicle; and (4) the length of time during which the defendant drove or occupied the vehicle.  *Id.; see also People v. Emery*,  389 N.W.2d 472, 476 (Mich. Ct. App. 1986).  Because the Michigan Court of Appeals did not address this argument, this Court will perform a *de novo* review.  *See McKenzie*, 326 F.3d at 727.

Officer David Lilly testified that he found a .32 caliber semiautomatic gun under the driver's seat of Petitioner's Oldsmobile 98.  (Tr. II, 116-18.)  Detective Kent Cooper verified with the Secretary of State that Petitioner owned the car.  (Tr. II, 156-57.)  Petitioner also testified that he drove the car prior to his arrest.  (Tr. III, 291-92.)  Because Petitioner owned and drove the vehicle in which the gun was found, the first factor weighs against Petitioner.  As for Petitioner's knowledge

of the weapon, Officer Michael Duke testified that the handle of the gun was visible when he was sitting down in the driver's seat. (Tr. III, 198.) The jury might also infer guilty knowledge from Petitioner's flight from the police officers and the attempt to hide his car keys down his pants. As a result, a jury could reasonably infer that Petitioner knew the weapon was present in the car. The jury could also reasonably infer from the evidence that Petitioner was indeed "carrying" the gun. *See Butler*, 319 N.W.2d at 545 n.11. The gun was under the driver's seat, so it was readily accessible to Petitioner. Petitioner possessed the car keys to gain access to the gun and he owned and drove the car in which the gun was found. Because there was sufficient evidence to convict Petitioner of carrying a concealed weapon in an automobile under *Jackson*, the Court concludes that Petitioner is not entitled to habeas relief on this claim.

### **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date: May 27, 2010                     /s/ Ellen S. Carmody
                                       ELLEN S. CARMODY
                                       United States Magistrate Judge



### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).